**THE LAW OFFICES OF C.R. HYDE, PLC**
**CHARLES R. HYDE**
**2810 NORTH SWAN SUITE 160**
**TUCSON, ARIZONA 85701**
**TELEPHONE: (520) 270-1110**
**FACSIMILE: (520) 547-2475**
**CRHYDE@OLDPUEBLOBANKRUPTCY.COM**
**SBA # 22512**

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | In Proceedings under Chapter 11 |
| ARTHUR W. GRIMM III and CYNTHIA GRIMM, | Case No. 4:16-bk-12285-SHG |
| Debtors. | **DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT DATED JULY 16, 2018** |

## DISCLOSURE STATEMENT FOR DEBTOR'S CHAPTER 11 PLAN

### TABLE OF CONTENTS

I.   Introduction…………………………………………………………………4
     A.   General Information……………………………………………………4
     B.   Classification of Claims and Interests…………………………………6
     C.   Voting…………………………………………………………………7
     D.   Confirmation Hearing…………………………………………………8

II.  Overview of the Debtors' and the Business or Employment Affairs………… ….9

III. Events Precipitating the Chapter 11 Petition…………………………………9

IV.  Significant Events During the Chapter 11………………………………...10

V.   Significant Non-Events During The Chapter 11…………… ……… . …… . . 21

VI.  Summary of the Plan …………………………………………...…………22
     A.   Overview………………………………………………………...…22
     B.   Classification and Treatment of Claims and Interests……………...22

VII.     Executory Contracts and Unexpired Leases……………………….…………34

VIII.  Means for Executing and Implementing the Plan ………………….……….35
     A.     Means of Funding the Plan …………………………………………35
     B.     Causes of Action…………………… …………………………………39
     C.     Objections to Claims and Interests……………………………………40
     D.     Tax Compliance………………………………………………………...41
     E.     Vesting…………………………………………………………………41

IX.     Distribution under the Plan……………………………………………………41
     A.     Manner of Payments…………………………………………………41
     B.     Post-Petition Interest, Fees, and Costs………………………………42

X.     Effect of Plan on Claims………………………………………………………42
     A.     Effect of Confirmation………………………………………………42
     B.     Debtors' Authority to Compromise and Settle……………………..…...43
     C.     Right of Setoff……………………………………………………….....44

XI.     Liquidation Analysis……………………………………………..………....44

XII.     Risk Analysis…………………………………………………………………44
     A.     General………………………………………………………………44
     B.     Financial Projections……………………………………………......45
     C.     Alternatives to Confirmation of the Plan………………………………46

XIII.  Tax Consequences……………………………………………………………..47

XIV.  Confirmation Process…………………………………………………………47

2

**EXHIBITS**

EXHIBIT A          First Amended Plan of Reorganization Dated February 9, 2018

EXHIBIT B          Liquidation Analysis – NOT PROVIDED

EXHIBIT C          Financial Projections June 2018 Through 2023

EXHIBIT D          The Mastick Insurance Claim Dated January 8, 2018

EXHIBIT E           ADEQ Tank Site Improvement Program

EXHIBIT F          Unsecured Promissory Note and Credit Agreement

EXHIBIT G          February 6, 2018 Letter from Jeong to Debtors

EXHIBIT H          Lizardi Calculation and Debtor's Mark Up of Rents Demanded by

                   February 6, 2018 Jeong Letters.

EXHIBIT I          Big Art's, LLC Notice of Disagreement

EXHIBIT J          ADEQ Second Lust Case Correspondence dated April 8, 2018

EXHIBIT K          Bender Baseline Assessment Test

3

# I. Introduction

Arthur W. Grimm, III and Cynthia Grimm, as debtors and debtors-in-possession (the "Debtors"), proposes the following chapter 11 Plan of Reorganization (the "Plan") pursuant to section 1121(a) of the United States Bankruptcy Code. All capitalized terms used in the Plan are defined either in section 101 of the Bankruptcy Code or in Article I to the Plan. The Plan sets forth how Administrative Expenses, Claims against and Equity Interests in the Debtors will be treated upon the Debtors emergence from chapter 11 if the Plan is confirmed by the Bankruptcy Court and is thereafter consummated. This Disclosure Statement describes certain aspects of the Plan, the Debtors' business operations, significant events leading to the Chapter 11 Cases, and related matters. For a complete understanding of the Plan, you should read this Disclosure Statement, the Plan and all of their related exhibits and schedules in their entirety. The Debtors believe that the Plan complies with all provisions of the bankruptcy code and will enable him to restructure his debt successfully and accomplish the objectives of Chapter 11, and therefore that acceptance of the Plan is in the best interest of the Debtors, the Debtors' estate and creditors.

## A. General Information

The Debtors submit this disclosure statement to holders of Claims against and Interests in the Debtors for the purpose of soliciting acceptance of the Plan.

The Debtors believe this Disclosure Statement contains the material, important, and necessary information for creditors to arrive at an informed decision in exercising their right to vote for acceptance or rejection of the Plan.

4

Most words or phrases in this Disclosure Statement have their usual and customary meanings. Certain capitalized terms have the same meaning as defined in the Plan. If not otherwise defined, certain terms in this Disclosure Statement have the meaning provided in the Bankruptcy Code or Bankruptcy Rules.

Unless otherwise noted, those portions of the Plan and this Disclosure Statement providing factual information concerning the Debtors, including assets and liabilities, have been prepared from information submitted by the Debtors and professionals retained by the Debtor. Where necessary, work product relating to professional opinions of environmental condition or quality are attached. Discussion of Big Art's, LLC's eligibility for, admission to or benefits of the Baseline Assessment Program are sourced from Blaes Enviormental and Dan Blaes. Values ascribed to consumer goods or residential real estate were derived only from the Debtors.

The financial information contained in this Disclosure Statement has not been subjected to an audit by an independent certified public accountant. For that reason, neither the Debtors nor Debtors' Counsel are able to warrant or represent the information contained in this Disclosure Statement is without any inaccuracy. To the extent practicable, the information has been prepared from the Debtors' financial books and records and great effort has been made to ensure that all such information is accurate.

The Disclosure Statement and the Plan will classify all creditors into Classes. The treatment of each class of creditors will be set forth in this Disclosure Statement and in the

5

Plan. You should carefully examine the treatment of the Class to which your claim will be assigned.

This Disclosure Statement must be approved by the Bankruptcy Court after notice and a hearing pursuant to section 1125 of the Bankruptcy Code. Approval of the Disclosure Statement by the Bankruptcy Court does not constitute either certification or approval of the Debtors Plan or that the Disclosure Statement is without any inaccuracy. Creditors may vote on the Plan once the Disclosure Statement is approved by the Bankruptcy Court.

No representations concerning the Debtors or the Plan are authorized other than as set forth in this Disclosure Statement.

**B.**    **Classification of Claims and Interests**

The following table designates the Classes of Claims and Interests in the Debtor, and specifies the Classes that are impaired by the Plan and entitled to vote to accept or reject the Plan. A detailed description of the Classes of Claims and Interests is provided in Section VII below.

| Class | Description | Impairment | Entitled to Vote |
|---|---|---|---|
| 1 | Priority Tax Claims | Unimpaired | No |
| 2 | Secured Claim of Wells Fargo – River Road | Unimpaired | No |
| 3 | Secured Claim of Wells Fargo – ("Bankard Property") | Unimpaired | No |

6

| 4 | Unliquidated Pre-Petition Unliquidated Lease Cure Claim of Mastick Trust | Unimpaired | No |
|---|---|---|---|
| 5 | General Unsecured Claims | Unimpaired | No |
| 6 | Contingent, Unliquidated and Disputed Claims | Unimpaired | No |
| 7 | Debtors' Interest | Impaired | No |

### C. <u>Voting</u>

As a Creditor, your vote is important. All Holders of impaired Claims are encouraged to vote. All Creditors entitled to vote must cast their vote by completing, dating, and signing the ballot mailed to them with the Disclosure Statement once it is approved. The ballot will contain instructions concerning the deadline for submitting the ballot and the address where the ballot should be mailed.

The Court will confirm the Plan if the requirements of section 1129 of the Bankruptcy Code are met. The Court must determine whether the Plan has been accepted by each impaired Class entitled to vote. Impaired Classes entitled to vote are those Classes of Claims and Interests whose legal, equitable or contractual rights are altered, as defined by section 1124 of the Bankruptcy Code.

Pursuant to section 1126(c) of the Bankruptcy Code, for a Class of Claims to accept the Plan, there must be acceptance by Holders of: (a) at least two-thirds of the dollar amount

7

of the Allowed Claims of such class that actually vote on the Plan; and (b) more than one-half in number of the Allowed Claims of such class that actually vote on the Plan. Failure to vote does not constitute either an acceptance or a rejection of the Plan.

The Plan may be confirmed under section 1129(b) of the Bankruptcy Code even if each class of Creditors does not accept the Plan, so long as one impaired class of Creditors accepts the Plan. Only the votes of Creditors or Interested parties whose ballots are timely received will be counted in determining acceptance of the Plan. Ballots must be received by counsel for the Debtor no later than 5:00 p.m., Arizona time, on _____, 2018 at the following address:

> The Law Offices of C.R. Hyde, PLC
> 2810 North Swan Road Suite 160
> Tucson, Arizona 85712

**D.** **Confirmation Hearing**

In accordance with section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), a hearing will be held before the Honorable Scott Gan, 38 S. Scott, Ave., Tucson, AZ 85701, at a time and date to be set by this Court and noticed out to all interested parties. At such hearing, the Court will consider whether the requirements for confirmation have been met and whether the Plan has received the requisite acceptance, or whether the Plan can be confirmed pursuant to Section 1129(b) of the Bankruptcy Code. At the Confirmation Hearing, the Debtors will request confirmation of the Plan.

8

## II. Overview of the Debtors and Their Business Affairs

### A. History of the Debtors

Debtors have resided in Santa Cruz County, Arizona for over seven (7) decades. They have continuously operated a service station on Mariposa Road since they entered into that certain Lease Agreement ("Mastick Lease") with the Mastick Trust ("Mastick"). They have enjoyed the benefits that are conferred upon those who take up residence in one place for such a long time. They have honorably, humbly and in good faith operated their service station. In addition to operating the service station, Debtors also sub-lease retail commercial property on the leased premises. The retail commercial parcel adjacent to the leased premises was owned by the Mastick Trust but was not initially part of the Mastick Lease. The retail commercial parcel became part of the Mastick Lease in 1987 by way of a second amendment to the Mastick Lease. The second amendment to the Mastick Lease came about as a result of the Mastick Trust defaulting on a loan secured by the retail commercial parcel. Debtors decided to use their money, and retire a loan owed by the Mastick Trust in consideration for the second amendment to the Mastick Lease.

## III. Events Precipitating the Bankruptcy Case

Mastick filed a forcible detainer and eviction action in 2016 ("FED Action") in Arizona Superior Court in and for Santa Cruz County. The FED Action alleged a variety of breaches under the Mastick Lease, both monetary and non-monetary in nature. Mastick alleged that Debtors' failure to sell fuel for a period of time constituted a material default under the Matick Lease and that such material default provided a basis for terminating the

9

Matick Lease.   In essence, Mastick alleged that the Lease was validly terminated or should be terminated.   Debtor answered the complaint, denied all causes of action and litigation ensued without liability being affixed or any claims of either party being liquidated.

The legal costs associated with the FED Action, combined with the Debtors' other debt obligations, made it prudent for Debtors to consider filing a petition for bankruptcy. Debtors also felt that the financial costs attendant to the FED Action could be better contained in the context of bankruptcy.   Therefore Debtor's filed a petition for bankruptcy relief under subchapter 13 of the Bankruptcy Code on October 26, 2018.

### IV.  Significant Events During the Bankruptcy Case

### A.  <u>Administrative Proceedings</u>

On November 10, 2016, the Debtor commenced the instant bankruptcy case under Chapter 13 of Title 11.   The Debtor filed a Chapter 13 Plan on December 5, 2016.   The Debtor sought to convert the case to Chapter 11 on May 9, 2017 by proper motion.   The Order converting the case to Chapter 11 was entered on August 15, 2017.

### B.  <u>The Court's January 19, 2018 Ruling Determined that the Lease was Not Terminated Pre-Petition; Future Plans for the Leased Premises Upon Assumption</u>

Based on the Court's Ruling and Mastick's relenting, Debtor will promptly cure and assume the Lease, continue to retain the option (as opposed to the obligation) to operate a service station, and sublease commercial spaces in the ordinary course of its business. Upon assumption and, reserved formally by the Amended Plan, Debtor could elect to assign the Mastick Lease for value.

10

## C.     <u>Retention of Professionals</u>

Court approved the Application of the Law Offices of C.R. Hyde, PLC on September 12, 2017 as a profession in connection with the Chapter 11 matter. The Court also approved the employment of Leonard Lizardi as CPA for the Debtor on October 17, 2017. The Debtor has hired Fennemore Craig as special litigation counsel in connection with any ADEQ compliance matters involving Debtor and to litigate those common law intentional tort claims, general tort claims, common law contract claims, Section 362 stay violation claims and any other such statutory claims that have accrued and continue to accrue. Additionally, special counsel may assist the Debtor to pursue all damages and sanctions claims it holds against Mastick, and, where appropriate, Mastick's counsel of record, pursuant to 28 U.S.C. § 1928, and Fed. R. Bankr. P. 9011.

## D.     <u>Preparation and Filing of Tax Returns of Any Kind</u>

Debtor is current on the preparation and filing of all federal and state income tax returns, and any state and local tax returns that are required as a result of Debtor's operation of a service station.

## E.     <u>Real and Personal Property</u>

All real and personal property known to the Debtor is described in detail in the Debtor's Schedules. In summary, this property consists of the following:

         i.      Presuming the entry of an Order permitting assumption, and presuming the Debtors' cure of any condition to assumption, the Lease, inclusive of the Debtors'

11

preservation of the ability to assign the Lease pursuant to 11 U.S.C. § 365(c) and sublease parts of the premises subject to the Lease as discussed below;

  ii. Debtor's sanctions and damages claims against Mastick, Suzy Mastick or her counsel;

  iii. Debtor's net operating income from its management of Big Art's Service Station, LLC;

  iv. Debtor's anticipated future rental income to those subtenants who will occupy the retail commercial property at the Leased Premises as subtenants of Debtor;

  v. Those residential tenants who now and in the future may lease property from Debtor on Debtor's homestead;

  vi. Those anticipated net sale proceeds, after satisfaction of the Wells Fargo judgment lien, from the sale of the Bankard Property;

  vii. Grimm Investments, Inc. was the operating company that preceded Big Art's Service Station, LLC.  For all intents and purposes, Grimm Investments, Inc. is a disregarded entity, was always named as an additional insured on the environmental liability insurance policy for continuity reasons, has no operating income.  The relationship between the two is that Grimm Investments, Inc. is a predecessor operator of the service station.

  viii. Debtors' primary residence on River Road.

**F.** **Accounts Receivable and Affiliates**

The Debtor has no outstanding accounts receivable.  Grimm Investments, Inc. is a non-debtor entity which has no appreciable assets except a liquor license identified in the

12

Debtors' schedules which is treated as property of the estate.  The liquor license is not of a kind that holds value or is transferrable.

**G.**     **Preference/Fraudulent Transfer Causes of Actions**

Debtor's 11 U.S.C. §§ 544 and 545 avoidance/preservation claim against Sherman Montgomery, which shall be rendered moot upon entry of an order confirming Debtor's Chapter 11 Plan.

**H.**     On January 18, 2018 the Court issued a Ruling that Mastick failed to validly terminate the Mastick Lease prior to the Order for Relief in this matter.  The Court therefore ruled that the Mastick Lease was unexpired and subject to assumption.  The Ruling served as a threshold matter to the Debtor's Motion to Assume the Lease which was to be heard on February 7, 2018.  Despite its written objections, on February 7, 2018, Mastick withdrew its objection and its motion to continue the evidentiary hearing agreed to permit Debtors to assume the Mastick Lease subject to its prompt cure of very nominal monetary sums.

**I.**     On January 8, 2018 Suzy Mastick chose to write a letter ("Mastick Letter") to Debtor's environmental liability insurance carrier, Argo Group, US.  The Mastick letter attempts to file a claim ("Mastick Claim") as an additional insured under the same policy.  To no one's surprise, the Mastick Letter was treated by the Argo Group, US as a filed claim by an additional insured under the Policy.  The basis cited in the Mastick Letter for filing a claim was that Mastick became, "informed that a release emanating from an underground

storage tank or storage tank system has occurred." The Mastick Letter is attached hereto as Exhibit "D". It is unclear from the letter from who or from where Mastick became informed of the fact forming the basis of the Mastick Claim. It continues to remain unclear to Debtors what information was relied upon by the person that informed Mastick of the fact(s) that formed the basis for the Mastick Claim.

**J.**     In connection with its duties of regulatory compliance as a facility operator, Debtor and its operating company, Big Art's Service Station, LLC ("Big Art's, LLC"), hired Dan Blaes ("Blaes") and Blaes Environmental Management, Inc. ("BEM") to conduct a Site Assessment/Site Check. BEM commenced work in connection with the Site Assessment in late December 2017. BEM issued a written report on January 2, 2018 ("BEM Report"). At the recommendation of Blaes at page 6 of the BEM Report, the BEM Report was delivered to the Arizona Department of Economic Quality ("ADEQ") in early January 2018.

**K**.     Mastick deposed Blaes on January 4, 2018 for more than two (2) hours in connection with the BEM report. The BEM report concludes that there are no underground storage tank leaks or releases of the kind described in the Mastick Claim.

**L.**     Debtors became aware of the Mastick Claim on January 25, 2018 when a senior claims adjuster contacted Art Grimm about the same. Counsel for Debtor was subsequently made aware of the Mastick Claim by Debtor.

**M.**     By proper motion, Debtor is seeking to borrow monies on a revolving line of credit and unsecured basis to guard against:

i. any litigation costs associated with the Mastick Lease;

ii. to fund any operating deficits;

iii. to cover any costs associated with ADEQ compliance issues;

iv. to fund any plan payments in the event the Plan is at risk of being in default for any reason, foreseen or unforeseen.

**N.** Mastick conducted a multitude of depositions in connection with the Mastick's Objection to Debtor's Motion to Assume the Mastick Lease.

i. Debtors were together deposed for approximately seven (7) hours in September 2017;

ii. Debtor's CPA was deposed for at least an hour;

iii. Debtor Cindy Grimm's ninety three (93) year old father, Sherman Montgomery, was deposed between the time 10:00 a.m. to 2:25 p.m. on December 6, 2017;

iv. Rod Reyes, a licensed professional who performed corrective action on Debtor's tanks, valves and dispensing equipment in 2016 was deposed on November 15, 2017 between the time of 9:00 a.m. and 11:51 a.m.;

v. A custodian of the Arizona Department of Economic Quality was deposed;

15

vi. Mastick deposed her own daughter in furtherance of Mastick's objection to Debtor's Motion to Assume.

**O.** Debtor filed its initial Plan of Reorganization on January 5, 2018. A Plan of Reorganization Dated July 16, 2018 ("Amended Plan") is attached hereto as Exhibit "A" and filed contemporaneous to the foregoing.

**P.** Debtor has had meaningful conversations with a family who own and operate multiple service stations in Tucson and Benson, and although it is not detailed as a specific exit strategy, discussions continue relating to such an assignment of the Mastick Lease for consideration that would inure to the benefit of the estate;

**Q.** Debtor's Amended Plan contemplates a cause of action against Mastick, the Mastick Trust for breach of contract, tortious interference with a business operation and sanctions for violations of Rule 9011 of Bank. R. Civ. Pro. Rule 11 of the Federal Rules of Civil Procedure, and 28 U.S.C. 1927 (as to her counsel of record), for frivolous and dilatory litigation, needlessly increasing the cost of litigation, and for filing pleadings that are knowingly false and/or for an improper purpose. The foregoing is neither exhaustive nor limiting, and that the special litigation counsel to be hired in connection with ADEQ matters and specifically for this piece of litigation shall assist Debtor in developing with specificity all causes of action.

16

**R.** Mastick prepared and elected to file a proof of claim ("Mastick POC") on March 3, 2017 which was assigned Claim #5. The Mastick POC alleged damages in excess of $150,000.00 in connection with the alleged material breaches of the Lease;

**S.** Mastick's alleged damages closely mirror her sworn allegations in the 2016 FED Action;

**T.** The Matick POC was filed by Mastick, through her attorneys, and was filed subject to 15 U.S.C. § 152; The Mastick POC was amended (5-2) on April 5, 2018. Additionally Mastick filed an administrative claim identified as Proof of Claim 10. The amended Mastick POC and Proof of Claim 10 have been objected to on various grounds.

**U.** February 6, 2018: ADEQ issues Leaking Underground Storage Tank (LUST) case number with letter to Big Art's, LLC based on the Mastick Claim that was filed to Big Art's, LLC's insurance company against his LUST policy. The LUST case was prompted by the Mastick Claim, ADEQ purportedly based the LUST issuance on the data within the Site Check report completed by Blaes Environmental. The letters from ADEQ were titled "Corrective Action Requirements" and "UST System Release Confirmation".

**V.** March 5, 2018: Big Art's, LLC, through special counsel Fennemore Craig, prepared and submitted a Notice of Disagreement (appeal) of the ADEQ decision to issue a LUST case based on the data within the Blaes report. The Notice of Disagreement is attached hereto as Exhibit "I".

17

**W.** On April 9, 2018 a meeting on the Notice of Disagreement and the LUST case took place. In attendance were ADEQ, Debtors and counsel, Mastick Trust and counsel, Blaes Environmental, and representatives from the Debtors' insurance carrier.

**X.** From the meeting ADEQ, Mastick Trust and Debtors agreed to have the State of Arizona fund a Baseline Assessment to confirm the environmental condition of the site around the underground tanks, product piping, and fuel dispensers. Both the Mastick Trust and Big Art's, LLC agreed to use Bender Environmental ("Bender") to conduct the Baseline Assessment drilling program.

**Y.** Shortly after the April 2018 meeting, Bender submits a Baseline Assessment Workplan on behalf of Big Art's, LLC to ADEQ for approval. After several iterations, the scope of work is approved by ADEQ.

**Z** On April 26, 2018 Bender Environmental completed the field portion of its Baseline Assessment study and submitted soil samples for laboratory analysis. Unlike the December 2017 samples obtained by Blaes Environmental, no groundwater was found in any of the borings and Bender concluded this is due to only a seasonal perched gw zone which occurs at the site and then goes away.

**Aa.** On May 7, 2018 Bender completed the Baseline Assessment Report and the report was submitted to ADEQ on May 8, 2018. Bender concluded that petroleum hydrocarbons found near one of the fuel dispensers at the site is likely from a surface spill.

Bender Environmental did not conclude there had been a UST system release in the report. The Report is attached hereto as Exhibit J.

**Ab.** May 4, 2018: Colony Insurance sends a letter that appears to deny the first insurance claim based on the Blaes report data and the other information supplied to them. Because Colony Insurance had an expert who is a peer of Bender who had access to the soil test results, Colony Insurance denied the insurance claim before ADEQ made any decision of its own.

**Ac.** May 11, 2018: Big Art's files a second claim against the Colony Insurance policy in the event that ADEQ decided to open up a new case based on the Baseline Assessment Report. Big Art's, LLC made the claim on May 11, 2018 because the Colony Insurance policy was expiring at the end of the day on May 12, 2018 and all claims need to have been made during the policy period. Since Colony Insurance policy, Big Art's, LLC could not wait for ADEQ's written determination.

**Ad.** The Colony Insurance Policy Expired on May 12, 2018. Debtors and Big Art's, LLC obtained replacement coverage at a higher premium and a higher deductible after tremendous effort by his agent and Grimm.

**Ae.** ADEQ issued a letter to Big Art's, LLC on May 18, 2018 confirming that ADEQ was closing the first LUST case but was opening up a second LUST case for the hydrocarbons found at the dispenser during the Baseline Assessment program. Big Art's,

LLC is waiting for the new ADEQ letter but will appeal the decision given the professional judgement issued by Bender Environmental in the report. See Exhibit K attached hereto.

**Af.**     The Baseline Assessment Program permits Big Art's, LLC to be reimbursed by the state of Arizona for any of the testing Bender performed on its behalf.

**Ag.**     At present Debtor is unaware of any actual costs Big Art's, LLC will incur as related to the unanimously concluded surface spill near on of the tanks. It is possible that the remediation of that surface spill would be covered by the state but it is not clear. Debtor estimates that costs of remediation of such a surface spill would not exceed $10,000.00.

**Ah.**     Because Big Art's, LLC was admitted into the Baseline Assessment Program, it is possible that any requirement that a tank be closed "permanently in place" or the tank system removed all together that Big Art's, LLC is eligible for reimbursement for such expense.

**Ai.**     For reasons stated above, it is highly unlikely that Colony Insurance is going to cover the surface spill which is related to the second claim filed by Debtors in May 2018. Even if it were a covered claim the deductible to Big Art's, LLC equals or exceeds the estimate of the remediation according to Blaes.

**Aj**.     An informal appeal meeting on the second open LUST matter is scheduled with ADEQ for July 16, 2018.

**Ak.**     Debtors tendered check numbers 141 and 142 in the respective amounts of $4,898.91 and $875.86 to Mastick.  Debtors also tendered check 146 in the amount of $1,834.76 in full satisfaction of the monetary condition to assuming the Mastick Lease.

## V.     SIGNIFICANT NON-EVENTS DURING THE BANKRUPTCY PROCEEDING

A. To date Mastick never exercised her express or implied rights under the Mastick Lease to obtain any test of the soil at the Leased Premises

B. Mastick never exercised her express right under the Bankruptcy Code to request that Debtor's time to either assume or reject the Mastick Lease be accelerated due to exigent circumstances such as the suspicion or actual knowledge of an environmental problem that would expose Mastick to liability;

C. Mastick never sought a pre-trial determination that the Lease had been validly terminated pre-petition as a matter of law;

D. Mastick never sought to modify the provisions of 11 USC § 362 in order to determine liability in the FED Action**;**

E. Mastick has yet to file an adversary complaint to determine liability of her claim;

F. Mastick did not file an adversary complaint to determine the nondischargeability of the Mastick Claim;

G. Mastick did not inform Debtors of her intent to file a Claim with Argo Group, UC;

21

H. ADEQ is aware of the bankruptcy and until the Mastick Letter had taken no material steps to enforce any of its regulatory rights or authority over the Debtor or Big Arts, LLC;

I. To date, the Mastick POC (5-2) has not been amended to reflect those prepetition monetary cure payments tendered by Debtor;

## VI. SUMMARY OF THE PLAN

**THE FOLLOWING IS ONLY A SUMMARY OF THE PLAN OF REORGANIZATION. IN THE EVENT OF ANY INCONSISTENCY, THE EXPRESS TERMS OF THE PLAN ITSELF SHALL GOVERN.**

### A. Overview

The goal of the Plan is to provide for repayment of all claims against the Debtor to the extent repayment is required under the Bankruptcy Code. Based on the liquated assets currently held by the estate, the Debtor shall be able to repay all allowed Claims in full.

### B. Classification and Treatment of Claims and Interests

All Claims and Interests, except administrative expense and priority tax claims, are placed into classes as set forth below. A Claim or Interest is placed in a particular class, only to the extent that the Claim or Interest falls within the description of that class, and is classified in all other classes to the extent that any portion of the Claim or Interest falls within the description of such other class.

22

A Claim or Interest is placed into a particular class for all purposes, including voting on this Plan, confirmation, and receiving distributions pursuant to this Plan, only to the extent that such Claim or Interest is an Allowed Claim in that class, and such claim has not been paid, released, or otherwise settled prior to the Effective Date. The establishment of particular Classes or categories of Unclassified Priority Claims does not mean or imply that there are any Allowed Claims that fall into each such Class or category, and the Debtors, may later contend there are no such Allowed Claims in any given Class or category.

The following table provides only a summary of the classification, impairment, and entitlement to vote of Claims, and Interests under the Plan. For a complete description of the classification and treatment of Claims and Interests, reference should be made to the entire Disclosure Statement and the Plan and all exhibits attached thereto.

| Class | Description | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| 1 | Priority Tax Claims<br><br>$2,612.00 POC Filed 2018-3-28 | Unimpaired | No |
| 2 | Secured Claim of Wells Fargo – River Road | Unimpaired | No |
| 3 | Secured Claim of Wells Fargo – ("Bankard Property") | Unimpaired | No |
| 4 | Unliquidated Pre-Petition Unliquidated Lease Cure Claim of Mastick Trust | Unimpaired | No |

| 5 | General Unsecured Claims | Impaired | Yes |
|---|---|---|---|
| 6 | Contingent, Unliquidated and Disputed Claims | Unimpaired | No |
| 7 | Debtors' Interest | Impaired | No |

### *Itemized list of scheduled undisputed, unsecured non-priority debts*

| | | |
|---|---|---|
| Bank of America N.A. | 6754 | $2,565.00 |
| Bank of America, N.A. | 6096 | $2,500.00 |
| AZ Department of Environmental Quality | 8542 | $0.00 |
| Cavalry Spv I, LLC | 9042 | $3,299.94 |
| JP Morgan Chase Bank | | $931.00 |
| Home Depot Credit Card/ CBNA | | $174.00 |
| MERVYNS/SYNCB | 6763 | $ Unknown |
| Portfolio Recovery Associates, LLC. | | $174.02 |
| Rusing & Lopez | | $14,606.60 |
| Synchrony Bank | 6756 | $2,560.00 |
| Target Credit Card/ TD | 0492 | $ Unknown |
| Town & Country U-Store-It | tl11 | $ Unknown |
| Wells Fargo Bank N.A. | 6763 | $7,848.54 |

The total approximate amount of the general unsecured creditor class is $33,000.00 not all creditors have filed claims which is why only those filed claims were listed in section 6(c) below.

### C.      Unclassified Claims

Pursuant to 11 U.S.C. § 1123(a)(1), Administrative Expense Claims pursuant to section 507(a)(2) and (a)(4)(A) of the Bankruptcy Code are not classified under the Plan. These Claims are not considered impaired and holders of such Claims do not vote on the

Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code.

### 1. Administrative Expenses

**Generally**. Except to the extent that a Holder of an Administrative Expense Claim agrees to different treatment, or as otherwise provided for in the Plan, the Holders of Administrative Expense Claims will receive cash on account of and in the amount of such Administrative Expenses. Payment of Administrative Expenses will be made: (a) on the Effective Date; or (b) or as otherwise provided for in the Plan. A notice setting forth the Administrative Expense Bar Date will be filed on the Bankruptcy Court's docket.

**Professional Compensation**. Professionals employed at the expense of the Estates and entities who may be entitled to reimbursement or the allowance of fees and expenses from the Estates pursuant to section 503(b)(2)-(6) of the Bankruptcy Code shall receive cash in the amount awarded to such professionals and entities at such times and only in accordance with a Final Order entered pursuant to section 330 or 503(b)(2)-(6) of the Bankruptcy Code.

Any application for payment of an Administrative Expense must be filed within sixty days of the Effective Date (the "**Administrative Expenses Bar Date**"), or such other date as may be fixed by the Bankruptcy Court. The application for payment of an Administrative Expense will be paid by or on behalf of the Debtor or Reorganized Debtor on the (i) date of the order granting such award becomes a Final Order, (ii) or as soon

thereafter as is practicable, (iii) or such other terms as may be mutually agreed upon by the Professional and the Debtor or Reorganized Debtor.

The anticipated Administrative Expenses on the Effective Date include (1) Debtor's counsel's outstanding fees in the approximate amount of $60,000.00; however, this amount may vary depending on the plan confirmation process and related proceedings, and the decision making of Mastick as to whether to protract the administrative case but also how Debtors' claims against Mastick are defended; (2) Debtor's accountant's outstanding fees in the approximate amount of $10,000.00; however, this amount may vary depending on the extent of the work necessary to prepare unfiled tax returns of the Debtor; (3) Special Litigation counsel's fees are unknown at this time but should easily exceed $3,000.00 and could double if a second round of appeal work is necessary with ADEQ. This estimate does not contemplate any involvement in litigation of contract and tort claims against Mastick Trust as special counsel's involvement is undetermined at this time; (4) Post-petition unliquidated claims of Mastick relating to base rent increases, if any; (5) Environmental professional claims are the responsibility of Big Art's, LLC but Debtors do not anticipate out-of-pocket costs for such work by either Big Art's, LLC or Debtors themselves because of the environmental contamination status of the tanks and because of their eligibility and participation in the Baseline Assessment Program. The anticipated Administrative Expenses are an estimate and the Debtor reserves all rights to submit additional Administrative Expenses to the Bankruptcy Court for approval. Post-confirmation, the Debtor and their counsel will continue to incur fees, and it is anticipated the accountant will

26

continue to be employed and incur fees. Notwithstanding any of the foregoing, the applicable Debtor or Reorganized Debtor shall assume all post-petition liabilities, fees and expenses for, and make payment in the ordinary course to any Professional retained by the applicable Debtor or Reorganized Debtor as an ordinary course professional pursuant to that certain order of the Bankruptcy Court.

**U.S. Trustee's Fees**. All fees and charges assessed against the Estates pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date. The Debtors will file with the Court and serve on the U.S. Trustee a quarterly financial report for each quarter that the Case remains open in the format prescribed by the U.S. Trustee, and the Debtors will pay such quarterly fees as due for each post-confirmation quarter the case remains open.

**D**.     **Classified Claims**

Claims against the Debtor are classified for all purposes, including voting (unless otherwise specified), confirmation, and distribution pursuant to the Plan, as follows:

**<u>Class 1 – Priority Tax Claims</u>**

(a) **Impairment and Voting**. Class 1 is unimpaired under the Plan. Class 1 is not entitled to vote to accept or reject the Plan.

(b) **Class Members**. Class 1 could include a claim from the Internal Revenue Service (Proof of Claim #3) because there appears to be an unfiled 2012 return which may result in priority status when and if the Claim is amended. The Class 1 Claim of the IRS was amended in late March 2018 and reflects the filed return from 2012, shows no liability or penalty and liquidates the claim at approximately $2,500.00.

27

(c) **Distributions**. Class 1 Claims shall be paid in full at the statutory rate of interest for such claims over a period of twenty four months commencing the first full month after the effective date with each payment being the same amount.

### Class 2 - Secured Claim of Wells Fargo – River Road

(a) **Impairment and Voting**. Class 2 is unimpaired under the Plan. Class 2 is not entitled to vote to accept or reject the Plan.

(b) **Class Members**. Class 2 includes the Secured Claim of Wells Fargo Bank, N.A. ("Wells Fargo") ("Proof of Claim #2") secured by the Debtors' real property at 115 S. River Road, Nogales, AZ 85621 (the "River Road Property"). Pursuant to Proof of Claim #2, Wells Fargo has a secured claim in the amount of $103,756.27 (the "Claim Amount"), including the amount of $1,842.67 in arrears (the "Arrearage Amount") as of the Petition Date.

(c) **Distributions**. Debtors shall pay the Arrearage Amount within fourteen (14) days of the Effective Date if it has not already been paid. The Claim Amount shall continue to be paid pursuant to the underlying Note and Deed of Trust and not modified by the Amended Plan.

### Class 3 – Nonconsensual Judgment Lien Secured Claim of Wells Fargo Bank, N.A.

(a) **Impairment and Voting**. Class 3 is unimpaired under the Plan. Class 3 is not entitled to vote to accept or reject the Plan with the following described exceptions, those

28

exceptions being the same as those exceptions that could render the holders of Class 3 unimpaired.

(b) **Class Members**. Class 3 consists of a claim amount asserted by Wells Fargo Bank, N.A. ("Wells Fargo") ("Proof of Claim #9") in the amount of $53,070.59 (the "Claim Amount"). Wells Fargo identified its Class 3 claim as unsecured claim, despite the fact that Wells Fargo's claim was reduced to judgment more than ninety (90) days prior to the order for relief in this matter and duly recorded at the Santa Cruz County Recorder's Office. Debtors reserve the right to file an objection to Proof of Claim #9 or motion pursuant to 11 U.S.C. 522(f) to the extent that it impairs an exemption asserted by the Debtors. Debtors do not intend to file an objection to the holder of the Class 3 claim because despite Wells Fargo asserting that its claim was unsecured Wells Fargo's recorded judgment lien. Since the treatment of Class 3 does not provide for an interest component, and the Amended Plan is a 100% Plan, the estate is not going to be harmed if Debtor does not "take advantage" of the failure by Wells Fargo to identify itself as secured.

(c) **Distributions**. The Class 3 Claim shall be entitled to payment as a member of Class 3 and paid upon sale of the non-exempt real property fully securing its claim. Debtor shall satisfy Wells Fargo's Class 3 claim in full upon Wells Fargo's receipt of the net sale proceeds from the sale of the Bankard property which that is to be conveyed to Debtors' estate from the transferee, Sherman Montgomery, in full satisfaction of the estate's contingent claim against Montgomery pursuant to 11 U.S.C. §§ 544 and 545. No interest shall accrue on the Class 3 claim as of the order for relief and the Class 3 claim shall only

29

be paid the allowed amount of its claim as provided for in its Proof of Claim. In the unlikely event that the Class 3 claim is not satisfied in full through the timely sale of the Bankard property, any remaining balance shall be permitted to an allowed Class 5 general unsecured claim and shall be paid in full along with the holders of allowed Class 5 claims.

### Class 4 – Lease Cure Claim of Mastick Trust

(a) **Impairment and Voting**. Class 4 is unimpaired under the Plan. Class 4 is not entitled to vote to accept or reject the Plan.

(b) **Class Members**. Class 4 includes the disputed claim of the Annette Suzy Mastick Revocable Living Trust ("Mastick Trust"). The Mastick Trust filed Proof of Claim #5-2 which Debtors identify as contingent, disputed and unliquidated on their schedules and in their written objection to Claim #5-2. Mastick Trust's claim stems from an unexpired, multi-decade ground lease that has Mastick Trust as the landlord and Debtors as the tenant. The Mastick Trust claim was first captured by Proof of Claim #5, and was filed on December 14, 2017, and since amended on April 5, 2018. Under penalty of perjury Mastick Trust asserts in its most recent Proof of Claim #5 that it is owed $500,000.00. The Mastick Trust has taken the position that there exist environmental contamination concerns related to an underground storage tank that, if proven true, could render the lease "unassumable." Debtors disagrees with the arguments and analysis of the relevant authority that Mastick Trust believes to control this situation. It appears that more than two environmental experts agree that there is no underground storage tank release. Regardless of whether environmental liability is determined, such liability is mutually exclusive from Proof of

30

Claim #5-2. Debtor asserts that the claim asserted by Proof of Claim #5-2 is laughably overstated, worthy of sanctions and demonstrates a clear inability to grasp how 11 U.SC. § 365 limits Mastick's claim in the event of rejection of the Mastick Lease. Additionally, now that the Mastick Lease is to be assumed upon Debtors' cure of the same, Proof of Claim #5-2 is further limited and, from Debtors' perspective, zeroed out. The Debtors have objected to Proof of Claim #5-2. To the extent any part of Proof of Claim #5-2 is liquidated and ordered payable as a condition to Debtors' assumption shall have an allowed Class 4 Claim. Any portion of Claim #5-2 that is not administrative in nature or not ordered to be paid as a condition of assumption shall be paid as a general unsecured claim and have an allowed Class 5 Claim. As of July 16, 2018, Debtor believes that all pre-petition monetary cure payments which would have comprised Class 4 have been paid.

(c) **Distributions**. Two letters were addressed to Debtors from Mastick Trust's CPA on February 6, 2018. Each of the two letters identifies the cure amounts due for a separate period of time based on the consumer price indexes to be used in determining base rent changes under the Mastick Lease. One letter contemplates the base rent and allocable taxes for the period of January 2014 through December 2016. The other letter contemplates the base rent and allocable taxes for the period of January 1, 2017 through February 2018. Debtors have timely paid the amounts based on the math Lenny Lizardi told the Court that he would prepare, and the amounts due for those periods of time was paid by separate check. Mastick accepted those checks, although under a reservation of rights in early April 2018 because Mastick Trust believed more amounts were owed. Any amounts determined

to be due and owing in addition to what has already been paid shall be paid as soon as the correct amount is determined by the Court or agreed upon by the parties.

**Class 5 – General Unsecured Claims**

(a) **Impairment and Voting**. Class 5 is impaired by the Plan. Each Holder of an Impaired Allowed General Unsecured Claim is entitled to accept or reject the Plan.

(b) **Class Members**. Class 5 includes all Allowed Claims in the Debtors that are not entitled to priority, are not secured by an interest in the Debtors' property, and are not contingent, unliquidated, disputed or subject to treatment of another class of claims set forth herein. A complete list of all Class 5 claims is set forth in the Disclosure Statement at Page 24.

(c) **Treatment**. The holders of allowed Class 5 claims shall receive equal monthly payments in the amount of $400.00 beginning on the first day of the thirteenth (13th) full month following the effective date and until December 31, 2021. Commencing January 1, 2022 and each month thereafter until all Class 5 claims are paid in full, Debtors shall pay the monthly amounts of $800.00. In the event that the Bankard property produces net proceeds in excess of all closing costs and the secured claim of the holder of a Class 3 claim, the net proceeds shall be disbursed to Class 5 so long as there remain no outstanding administrative expense claims due at the time of the Bankard closing.

**Class 6 – Contingent, Unliquidated, and Disputed Claims**

(a) **Impairment and Voting**. Class 6 is impaired by the Plan. Class 6 is not entitled to vote to accept or reject the Plan.

(b) **Class Members**. Class 6 consists of claims that are either contingent, unliquidated, disputed, or any combination of the foregoing claims in the Debtors.

(c) **Treatment**. Class 6 shall receive no distribution under the Plan. In the event that any claims in Class 6 become liquidated, noncontingent and undisputed they shall be entitled to treatment as a holder of an allowed Class 5 claim. Any Class 6 claim that is allowed and permitted to participate as a holder of an allowed Class 5 claim shall not receive any distribution unless and until all claims held by the Debtor against the holder of that Class 5/6 claim have been liquidated and offset.

### Class 7 – Debtors' Interest

(a) **Impairment and Voting**. Class 7 is Impaired by the Plan. The Debtors are not entitled to vote to accept or reject the Plan.

(b) **Treatment**. On the Effective Date, all estate property shall vest in the Debtor.

**(c ) General Unsecured Claims**

To date, the following claims and amounts have either been scheduled by the Debtor or filed as a proof of claim in this case and are undisputed:

• Calvary SPV I, LLC…………………………….. (POC#1).............. $2,560.00

• Internal Revenue Service……………………….. (POC#3)……….. $5,431.44

• Wells Fargo Bank, N.A………………………… (POC#4)……….... $7,848.54

• Portfolio Recovery Associates, LLC……………(POC#6)………… $174.02

• Calvary SPV I, LLC…………………………..(POC#7)…………. $3,299.94

• Rusing & Lopez…………………………………(POC#8)…………$14,606.60

33

## VII. Executory Contracts and Unexpired Leases

The Debtor shall assume as of the Effective Date each Executory Contract and Unexpired Lease listed in <u>Schedule G</u>, as amended, whether written or oral, except as otherwise provided for in the Plan. Assumption means that the Debtor has elected to continue to perform obligations under such contracts and leases, and to cure defaults of the type that must be cured under the Code, if any. Entry of the Confirmation Order shall constitute approval of such assumption pursuant to sections 365 and 1123 of the Bankruptcy Code.

After the Effective Date, the Debtors may enter into new leases of Property without approval by the Court in the ordinary course of business as is necessary and proper to bring additional income to the estate. Such new leases will be in writing, and pre-petition leases may be formalized in new written leases.

Unless a rejection motion is filed prior to the Confirmation Hearing, no executory contracts or unexpired leases will be rejected.

Any individual or entity that is a party to an executory contract or unexpired lease assumed pursuant to the Plan who objects to such assumption must file with the Court a written statement stating the basis for the objection. This statement must be filed and served within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time. Any individual or entity that fails to file timely and serve such a statement will be deemed to have waived any objection to the proposed assumption.

## VIII. Means for Executing and Implementing the Plan

### A. Means of Funding the Plan

The Plan will be funded from a variety of sources:

1. Debtor's net business income from Big Art's Service Station, LLC may be used to fund Plan obligations for Classes 1, 2, 4 and 5;

2. Net sale proceeds from the sale of that real property at Bankard avenue

   a. After satisfying closing costs, statutory encumbrances, and the secured claim of Class 3, all then remaining net sale proceeds shall be disbursed to creditors in order of priority, with any unpaid administrative claims in this matter being paid first and in full.

   b. Debtors' amended schedule A asserts that the value of the Bankard property is $70,000.00, which would provide for net proceeds of approximately $20,000.00 to Class 5 claimants upon sale to partially satisfy Class 5 obligations as Debtor believes that by the time Bankard is sold that administrative claims will have been paid, that there are de minimis Class 1 priority claims at this time, that the Class 2 claim will be paid from Debtors' regular net    income from Big Art's, LLC, rental income from the River Road property or social security income.

35

3. Debtor's monthly passive income from the sublease of commercial property in connection with the Lease may be used to fund Plan obligations for Classes 1, 2, 4 and 5. Debtor is hoping to sublease the improved retail building for a lump sum of $250,000.00. Debtor is not amending the projections to contemplate this possibility because it is too early but the proposal contemplates the conveyance of Debtors' interest in that portion of the Mastick Lease that includes the non-service station commercial property.

4. Debtor's social security income may be used to fund Plan obligations for Classes 1, 2, 4 and 5. The value of this monthly amount is $2,000.00, as reflected in the Debtors' Plan Projections.

5. Debtor's monthly passive income from the lease of residential property at its River Road homestead may be used to fund Plan obligations for

Classes 1, 2, 4 and 5. Debtor estimates the monthly value of future rent to be $500.00 as reflected in its Plan Projections.

6. To the extent necessary, if Debtors do not have enough cash on hand, and in their business judgment Debtors shall utilize proceeds from a

post-petition loan in an amount not to exceed $75,000.00 from

Sherman Montgomery ("Montgomery") to satisfy any effective date payments such as administrative claims, or cure payments that may be a condition to assumption of the Lease associated with Class 4. The Note is attached hereto

36

as Exhibit "F" and is also an exhibit to an amended Motion to Incur Debt to reflect the unsecured quality of the loan. The Montgomery loan will accrue interest at 4% per annum and accrued interest shall be paid quarterly through the conclusion of the draw period specified in the Note. Upon expiration of the Draw Period, the Note shall be reamortized and paid over a period of five (5) years. Since the Draw Period speficied in the note is seven (7) years in length, the Debtor's Projections provide for only quarterly interest payments in the maximum possible amount which would be $750.00.

7.      As provided for in paragraph 2 above, Montgomery shall convey by quit claim deed the Bankard Property back to the Debtors by quit claim deed upon the Effective Date in full satisfaction of any claim the Estate would have against him for under Subchapter 5 of the Bankruptcy Code. See 11 U.S.C. §§ 544 and 545.      Montgomery shall also not assert a claim against the estate for any and all prepetition claims he holds, and shall additionally forever waive the same.

8.      Monetary Damages or monetary sanctions recovered by Debtor in connection with the Lease and the Mastick Claim due to those actions taken by Mastick within and without the bankruptcy matter that sound in tort, contract, or bankruptcy law including but not limited to violations of 11 U.S.C. § 362(k) and 28 U.S.C. § 1927 and Bankr. R. Fed. Pro. 9011.

9.     ADEQ Baseline Assessment Program and state monies relating to removal of underground storage facilities, which should include reimbursement to the Debtor or Big Arts, LLC for the costs already incurred for the services of BEM and perhaps Blaes.

10.     Dispensing equipment needing to be replaced or maintenance shall be paid by any of the following: fuel supplier's with no expectation of repayment, fuel supplier loan, Big Art's, LLC's operating income in the ordinary course, loan proceeds from Montgomery, borrowing against exempt equity in their primary residence.

11.     The first $100,000.00 is cost to replace is born by the state. The total cost is about $250,000.00. Debtors do not believe that replacing the tank system is necessary now or will be necessary to complete the Plan.

12.     If necessary, replacement of tank systems would be satisfied by state funds and a loan if and when it proves necessary. Debtor does not anticipate the need to place the fuel system in this or the next option term which would commence in 2019. Debtor is confident that the Plan will not only be substantially consummated by the end of the next option term, the Plan will be completed. If Debtor elects to not exercise subsequent options, Debtors' ability to afford a replacement tank system is moot and not an issue for confirmation.

13.     The ADEQ Baseline Assessment Program and availability of state monies dedicated to the removal of underground storage facilities or the permanent closure of the same "in place", challenges any theory that the Debtors' Plan is in unfeasible because of some looming cost. The maximum cost to remove the UST system is $20,000.00 per tank. Debtors or Big Art's, LLC is eligible for up to $20,000.00 per tank. Debtors would bear no cost in such removal efforts. The cost to permanently close a tank or the entire tank system is far less expensive and also covered by the state fund.

14.     The duration of the Plan will expire prior to Debtor having to provide notice of its intent to exercise what will be the second post-confirmation exclusive option to extend the Mastick Lease. Therefore, the health of either or both Debtors should not pose a bar to confirmation of the Debtors' Plan.

## B.     Causes of Action

Pursuant to section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtor shall retain all of the Debtor's causes action pursuant to applicable local, state or federal law. In particular, Debtor retains its claims against Mastick and any other claims against third parties that arise from the Debtors' claims against Mastick and any claim that stems from the Mastick Lease, the litigation in the administrative case, and as more particularly identified in multiple places above and also referred to in Debtor's Second Amended Plan. Debtors' opinion as to the value of the causes of action against Mastick or affiliates or agents is the minimum amount of $100,000.00 which would include and be a conservative

39

approximation of Debtors' professional fees and costs in this matter, professional fees and costs in the preceding state court matter, engineering fees, the cost of increased environmental contamination insurance coverage, et. seq.

### C.       Objections to Claims and Estimates of Claims

**Objections**.  The Reorganized Debtor or any other party in interest shall serve a copy of an objection upon the Holder of the Claim that was not scheduled, or was scheduled as disputed, contingent, or unliquidated, that has not been allowed by a Final Order of the Bankruptcy Court, as soon as is practicable.  Any Claim that was not scheduled and for which no Proof of Claim was filed will be disallowed.

Consistent with the treatment of the holders of Class 6 Claims, there shall be no distribution to the holder of a Disputed Claim until the Objection to the Claim has been resolved by a Final Order of the Bankruptcy Court and the Claim has become an Allowed Claim.  Payments and distributions on account of each Disputed Claim that is allowed shall be made in accordance with the provisions of the Plan relating to the class of creditors to which the holder belongs.

At present an outstanding objection exist as to POC 5-2 and POC 10, which is indirectly connected to the Section 365 assumption matter and the Class 4 Claim.

**Estimations**.  The Debtor or Reorganized Debtor may, at any time, request the Bankruptcy Court to estimate any Claim, under section 502(c) of the Bankruptcy Code, regardless of whether the Debtor or Reorganized Debtor previously have objected to such

40

Claim, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim, at any time, including during litigation concerning any objection to such Claim.

### D.    Tax Compliance

The Reorganized Debtor will comply with all tax withholding and reporting requirements, including all distributions and receipts pursuant to this Plan, as applicable. All Holders of Allowed Claims and Interests shall have sole responsibility for any tax obligation imposed by any Governmental Unit pursuant to a distribution received under the Plan.

### E.    Vesting

Except as provided for in the Plan or Confirmation Order, on the Effective Date, the Debtor shall be vested with the remaining property or assets from the Estate, free and clear of all claims, liens, charges, and other interests of creditors arising prior to the filing date, except as provided by the Plan.

## IX.    Distributions Under the Plan

### A.    Manner of Payments

All distributions will be made in the form of cash payments to entities holding Claims at the addresses listed on the Proof of Claim filed by such entity as the address where payments are to be sent, unless other instructions are received in writing by the Debtor. Payments will be made by check, cashier's check, or wire transfer at the option of the Debtor.

**B.      Post-Petition Interest, Fees, and Costs**

Interest on and fees and expenses, if any, with respect to any Allowed Secured Claim, including but not limited to unpaid professional fees due the Holders of such Claims, shall be paid only to the extent permitted by section 506(b) of the Bankruptcy Code from the proceeds of the Collateral securing such Claims and to the extent any such Allowed Secured Claim is treated differently under the Plan.  Allowance thereof shall be determined separately for each Class and each subclass.  Any interest, fees and expenses paid during the pendency of these Cases to the Holder of any Allowed Secured Claim that are not allowable pursuant to Section 506(b) of the Bankruptcy Code shall be credited against and shall reduce the principal amount of any such Allowed Secured Claim.

**X.      Effect of Plan on Claims**

**A.      Effect of Confirmation**

Under Bankruptcy Code section 1141(d)(5), an individual Debtor will not be discharged from any debts unless and until: (i) Debtor completes all payments under the Plan and obtains an order of the Bankruptcy Court granting a discharge; (ii) the Bankruptcy Court grants a limited ("hardship") discharge as allowed under Bankruptcy Code section 1141(d)(5)(B); or (iii) the Bankruptcy Court orders otherwise for cause. Therefore the Debtor shall not be discharged from any categories of claims as set forth in the Plan until ordered by the Bankruptcy Court one of the reasons set forth above.  Non-dischargeable debts under Bankruptcy Code section 523 will not be discharged.

Holders of claims against the Debtor may not receive any payment or distribution except as otherwise provided for in the Plan, and may not seek any recourse against the Debtors or its assets except as provided for in the Plan. After the Confirmation Date, all holders of Claims will be forever enjoined from taking any action against the Debtor or its property on account of such claim; including the commencement or continuation of any proceeding; enforcing any judgment or award; creating, perfecting, or enforcing any lien; or any other action inconsistent with the terms of the Plan.

The Reorganized Debtor will move the Court to enter a discharge once the Plan has been substantially consummated and all claims contemplated under the Plan have been made in full. Until substantial consummation, the Reorganized Debtors will be responsible for filing pre- and post-confirmation reports required by the United States Trustee and paying the quarterly post-confirmation fees of the United States Trustee. Alternatively, the Court may enter a final decree closing the case on its own motion.

## B.    The Debtor's Authority to Compromise and Settle

Pursuant to Bankruptcy Rule 9019(a), the Debtor may compromise or settle any Claim or Interest, or any cause of action against a Debtor or brought by a Debtor upon notice and a hearing. Montgomery's delivery of a quit claim deed to the Debtors conveying all of his right and title in the Bankard Property upon confirmation of the Plan shall constitute the Court's approval of any and all claims by and between Montgomery and Debtor and no separate Rule 9019 Order shall be issued.

## C.    Right of Setoff

The Debtor may set off against any payment or distribution made pursuant to a Claim of any kind that Debtor may have against the Holder of such a Claim, Guarantor or Beneficiary of a Guaranty, but the Debtor will not be required to do so.  The failure to utilize the right of setoff does not constitute a waiver or release of any claim the Debtor have against a Holder of an Allowed Claim.

## XI.    Liquidation Analysis

Pursuant to 11 U.S.C. § 1129(a)(7), the Plan must provide that Creditors not accepting the Plan will receive at least as much under the Plan as they would receive in a hypothetical liquidation of the Debtor under Chapter 7 of the Bankruptcy Code.  A liquidation analysis for the Debtor is attached hereto because this is a 100% Plan which obviates the need to provide for any such analysis.

## XII.   Risk Analysis

### A.    General

The Debtor's substantial assets and comparatively small total outstanding claims indicate there will be sufficient assets to satisfy all Allowed Claims.  Consequently, the Debtor believes there is little to no risk to creditors and interested parties associated with this Plan.  Any risk that may exist is not any greater under this Plan than it would be in a

44

Chapter 7 liquidation or if the Cases were dismissed and Creditors were forced to collect through state law procedures.

**B.** **Financial Projections**

Financial Projections are attached hereto as **Exhibit "C"** and cover that (60) month period from the anticipated Effective Date of October 2018.

**1.** **Debtor notes that the Financial Projections:**

a. intentionally omit any projection of sublease income related to the Mastick Lease. This omission is not meant to suggest that sublease income as to the Mastick Lease is speculative or uncertain;

b. conservatively project net income from Big Art's, LLC to lend support to any question of feasibility, and is not to suggest that Debtor disbelieves its income is probably higher than projected.  Since this is a 100% plan it is not necessary;

c. provide no monetary figure or date in time is placed upon Debtor's receipt of income from its claims against Mastick.  This is not to suggest that the viability and collectability of the claim is in question.  It is only to suggest that it does not matter for purposes of plan confirmation under Section 1129 of the Bankruptcy Code.

d.       do not provide a line item expense related to Debtor or Big Arts, LLC's obligation to remediate or otherwise further comply with ADEQ directives, tender insurance deductibles is provided in the Projections.  This is again not

done to suggest that the Debtor or Big Art's, LLC do not have going forward compliance expenses of any size. It is only to make clear that any sum relating to compliance would be satisfied by: 1) Big Art's, LLC in the ordinary course of its business; 2) from Montgomery loan proceeds; or 3) through the ADEQ Baseline Assessment program paid for by a ADEQ, and other such programs whereby ADEQ provides monies to perform underground storage tank removal or complete the permanent closure (in place or otherwise) of underground storage tank.

e. the Mastick Lease rent expense identified shall not be construed as an admission of the pending question of the present base rent due and owing under the Mastick Lease.

f. the Plan Projections were prepared on a cash basis.

## C. <u>Alternatives to the Confirmation of the Plan</u>

If the Plan is not confirmed, there are several possible alternatives. First is to convert the Chapter 11 case to a Chapter 7 cases, have a Chapter 7 panel trustee appointed, and the Debtor's estate liquidated. The Debtor does not believe this is a suitable alternative. Considerable investigation, time, and effort have been put into evaluating the assets of the Debtor and determining the best course of action. It would be time-intensive for Chapter 7 Trustees to become familiar with the case, causing substantial delay and expense in the payment of Creditors. The second alternative is to dismiss the case, leaving Creditors to

46

resort to state law collection procedures, which is not a viable option for many of Unsecured Creditors.

### XIII. Tax Consequences

Pursuant to § 1125(a)(1) of the Bankruptcy Code, the Disclosure Statement is to provide a discussion of the possible material tax consequences of the Plan to the Debtor, any successor to the Debtor and a hypothetical investor typical of the Holders of Claims or Interests in the cases, such that would enable such investor to make an informed judgment about the Plan. The Debtor has not obtained a tax opinion and does not express any opinion as to the tax consequences to the Creditors or equity security Holders. Interested parties are encouraged to obtain their own professional counsel to determine the tax consequences of the Plan. In particular, to the extent any Creditor is not paid in full on its Allowed Claim, such Creditor should consult with a tax advisor concerning the potential for any write off of such Claim. It is generally anticipated that any discharge of debt will not have to be recognized as income for the Debtor for income tax purposes. It is anticipated that all Allowed Claims will be paid in full and thus no debts will be discharged.

### XIV. Confirmation Process

The Plan may be corrected or modified, prior or subsequent to Confirmation, or prior to consummation, after notice to interested parties and by Court order as provided by law. The Trustee further retains all rights to modify the Plan prior to Confirmation as permitted by 11 U.S.C. § 1127. The Plan may be amended or modified prior to Confirmation without leave of Court, so long as notice is provided to Creditors. After Confirmation and with

47

approval of the Court and upon notice to creditors, the Reorganized Debtors may remedy any defect or omission, or may reconcile any inconsistencies in the Plan or Confirmation Order, so long as such modification does not materially alter or adversely affect the interests of Creditors, to the extent it may be necessary to carry out the purposes and intent of the Plan.

The Court will be asked to confirm the Plan as to any Class of Claims or Interests that does not accept the Plan. In order to do so, the Court must find (1) that the Plan is fair and equitable to each class of Claims or Interests that is impaired and has not accepted the Plan and that the classification of claims is not discriminatory; and (2) that each claimant or interest-holder receives, under the Plan, property of a value as of the Effective Date that is not less than what would be received or retained if the Property were liquidated pursuant to Chapter 7 of the Bankruptcy Code.

The first requirement is satisfied with respect to any class that might not accept the Plan because the classification has not been designed in a discriminatory manner and any similar claims classified separately have been treated in this manner because they are either an administrative classification or arise from a substantially different economic basis. The second requirement is satisfied as demonstrated by the Liquidation Analysis provided.

If a Class of Secured Claims does not accept the Plan, the Bankruptcy Code provides that the fair and equitable requirement is satisfied if the class retains its lien and receives deferred cash payments of a present value equal to the value of the claimant's secured interest in the collateral. This requirement may be satisfied as to each class treated as a

48

Secured Claim because the Plan provides for them to receive the value of their interest in their collateral together with interest.

If a Class of unsecured Claims does not accept the Plan, the fair and equitable rule requires that (1) each impaired Unsecured Creditor receives or retains, under the Plan, Property of a value equal to the amount of its allowed Claim; or (2) the Holders of Claims and Interests that are junior to the Claims of the dissenting Class will not receive any Property under the Plan if Claims in the dissenting Class are not paid in full.

The Debtor recommends that the Plan and Amended Disclosure Statement be approved as it is in the best interests of the Estate and all creditors. The alternatives to confirmation of the Plan include dismissal or conversion to Chapter 7 liquidation. Dismissal would result in creditors having to resort to other legal proceedings to collect debts, and Chapter 7 liquidation would delay distributions and result in a slower and possibly lower recovery for unsecured creditors. For these reasons, the Debtor recommends all Creditors accept the Plan and return ballots timely so that the votes can be counted.

RESPECTFULLY SUBMITTED this 16th day of July 2018

The Law Offices of C.R. Hyde, PLC

By: ___/s/ C.R. Hyde_____

Charles R. Hyde, Attorney for the Debtor

49